### Louis Breiger v. The State.

No. 8126.   Delivered February 18, 1925.

**1.—Rape—Force Not Clearly Shown—Held, Not Sufficient.**

Where on a trial for rape the prosecutrix admits that no complaint was made by her until about six months after the alleged act of carnal intercourse, and that the force used by appellant did not amount to physical violence producing pain, nor a disarrangement of her clothing coupled with other facts negativing the use of that degree of force necessary to constitute that offense. the conviction will not be permitted to stand.   See Terry v. State, 266 S. W. 511.

**2.—Same—Evidence—Declarations of Prosecutrix—Too Remote—Inadmissible.**

Where on a trial for rape, prosecutrix, over appellant's objection was per-mitted to testify, that some time after the commission of the alleged offense, on one of her visits to Dr. Feaster, he said "well, sometimes boys are to blame" and that she replied "no, not in my case," such testimony was erroneously admitted.   The state may show why the prosecutrix did not make a com-plaint, or the reason why she delayed making, but such a declaration was not an outcry, nor a reason why she had not made such outcry. Such statement was self serving and hearsay and should have been excluded.

**3.—Same—Expert Witness—Hypothetical Question—Improper.**

A physician was permitted to testify that it was his opinion, based upon the facts testified to by the prosecutrix that she was penetrated upon the occasion in question. Objection was interposed that proof of such penetration could not be made in such manner, and was not the subject of expert testimony. This question was improper, and witness should not have been permitted to so testify, and for the errors discussed the cause is reversed, and remanded.

Appeal from the District Court of Williamson County. Tried below before the Hon. James R. Hamilton, Judge.

Appeal from a conviction for rape; penalty, five years in the penitentiary.

The opinion states the case.

*Amos Peters,* Taylor, *Wilcox & Graves,* Georgetown, for appellant.

*Tom Garrard,* State's Attorney, and *Grover C. Morris,* Assistant State's Attorney, for the State.

HAWKINS, JUDGE.—Conviction is for rape upon Mary Zak. Punishment, five years in the penitentiary.

Miss Zak is shown to have been a young woman twenty-six years of age. A short time after she went to work in a store in Taylor she met appellant at a dance. He would often pick her up in his car as she was coming to and from the store, and take her to whichever place she was bound. They would go automobile riding together and with other young people attended swimming parties. He professed to love her but never mentioned marriage. He had kissed her a number of times. The offense is claimed to have occurred on the night of December 25th. For perhaps a month prior to that time prosecutrix says appellant had been talking to her about girls and boys having "good times"; that she told him she was not that kind of a girl, to which he would reply that he knew she was a nice girl, but that everybody else was having "fun", and why couldn't they have some fun; that this was all he would say but that she understood what he meant; that she continued to go with him. A letter introduced in evidence written by prosecutrix (referred to more in detail later) indicates that the subject of having a "good time" was discussed between them more intimately and extensively than appears from the above recital. On the night of December 25th appellant and prosecutrix went in an automobile some two or three miles east from Taylor where the car was stopped. Prosecutrix testified as to what then occurred as follows:

"Then he stopped the car and he says, 'It sure is cold tonight;' he said, "take a little drink of whiskey'—he had something in a bottle, and he asked me to take a little drink of it, said it was whiskey. I said I didn't drink whiskey. He said, 'That won't hurt

you, it will make you feel good.' I refused, and he said 'You are just afraid it is something else, but it is six dollar whiskey,' and he said, 'I am going to take a drink myself and get drunk myself,' It smelled like whiskey; of course, I didn't take any myself, but it smelled like whiskey. And he said, 'Mary, this is Christmas night and we want to have some fun, I want you to be a real sweet little girl to me; let's have some fun.' I said 'What do you mean?' He said, ''That is all right. Let's have some fun like everybody else.' I said 'What do you take me for?' 'What do you think I am?' He says, 'Nothing,' he said, 'I know you are a nice girl, that is the reason I am going with you,' and he said, 'any time I ruin a girl I stay with her.' I said, 'No'. He said, 'Let's get out of the car.' I said, 'No.' I was just trembling. And he got out of the car and put his overcoat on the ground, and asked me to get out of the car. I wouldn't do it and he kept on begging. I said 'No,' and began crying. He said 'Hush your crying.' I was so excited I didn't know what to do. I stayed in the car and held myself on to the steering wheel. He kept on begging me and I kept on crying. He said, 'Come on, I am going to have my way this time,' and he got real rough with me. He took hold of me; he caught hold of my arms and jerked me until he jerked me out of the car and got me down on the ground and we had a fight there, and when I could get my breath I said, 'For God's sake, kill me before you do anything else.' He said, 'No, I am not going to kill you, you just keep still.' I was so excited I didn't know what to do any more. And he tried to get me, and he couldn't for a long time, and then I didn't know any more, I fainted. I didn't know any more until I was in the car and he had the car started. I just felt so weak and felt so sore. I said, 'What did you do to me?' He said, 'I didn't do anything.' I said, 'You surely did, I feel so bad.' He said, 'I didn't do anything.' I said, 'You take me straight home.' He said 'all right,' and he took me home. When I got out of the car and had this fight I fought with him and struggled with him. When I said I fainted I meant that I lost consciousness, I didn't know anything about what he done with me or how long he kept me down. I was in the car when I came to. The car was standing still. He was in the car when I first regained consciousness, or by the car cranking up. I don't remember if he had his overcoat on. I asked him then to take me home, and he took me home. I got home about 9:30. I did not know that night what he had done to me. That night I found a discoloration of some kind about my underclothes. Of course, I didn't know what it was, but it was kinder like blood on my clothes when I got home. In addition to that I felt weak and I was sore and felt bad and everything like that. The soreness was about my private parts.''

We condense her further testimony,—She says that about the second week in January she missed her menstrual period and went to Dr. Feaster for some medicine to correct the trouble; that she took the medicine without effect and a few days later went back to see him at which time he told her that sometimes boys were to blame for such condition to which she replied, "No, not in my case." (This testimony was objected to but we will advert to that later.) She claims that at the time she went to Dr. Feaster she did not know that the appellant actually had an act of intercourse· with her. After her second visit to Dr. Feaster she phoned for appellant to come to her house and claims that in a conversation she again asked him what he had done to her on Christmas night, and told him about having missed her menstrual period; that she told him she did not know whether he had done anything to her because she was unconscious at the time; that he told her then she need have no · worry, that so far as he was concerned there was nothing wrong with her. After that she went to see Dr. Miller. She says neither Dr. Feaster nor Dr. Miller told her she was pregnant. Some time in February she went to see Dr. Wedemeyer. After examining her she says he informed her she was in a "family way;" that she re-replied to him, "Could that be possible and me not know it?" to which she says he replied, "Of course, if you were unconscious you wouldn't know it, you must have fainted." She says that upon this occasion she told Dr. Wedemeyer what had occurred between her and appellant on Christmas night. This is the first report she made of the matter, claiming to have then ascertained for the first · time that appellant actually had intercourse with her. The record leaves it somewhat uncertain whether Dr. Wedemeyer told prosecu-trix she must have fainted and of course would have no knowledge of the act before prosecutrix related to him the circumstances of the transaction with appellant, or whether his statement in that respect was made after she had related them. We remark here if the story told by prosecutrix is true she had known from Christmas night up to the time of her conversation with Dr. Wedemeyer that appellant had made an outrageous assault upon her though falling short of an actual rape as she claimed to believe, but she had made no re-port of it. She did not even report the matter to the authorities after learning from Dr. Wedemyer that she was pregnant. She says that after her visit to Dr. Wedemeyer she again had a conversation with appellant in which he advised her to go to Dr. Feaster and see if he would relieve her condition; that Dr. Feaster declined to do so; that after reporting this to appellant she had a conversation with an attorney; that she then met appellant at the home of Father Dreiss, he being the Father in the Catholic Church to which both prosecutrix and appellant belonged. The conversation with ap-pellant at this time is not related by either prosecutrix or the priest.

The first report of the matter which appears to have been made to the authorities was when prosecutrix appeared before the grand jury in May some six months after the offense is alleged to have occurred. Prosecutrix testified on direct examination that after appellant pulled her out of the automobile they had a "fight" on the ground and she became unconscious. Upon cross examination she testified that he did not strike, kick, choke, threaten or bite her. She makes no claim that any of her clothing was in any manner torn or disturbed. Nothing is detailed which would ordinarily lead to fainting or unconsciousness. After their return to the home of prosecutrix appellant kissed her goodnight. Appellant introduced in evidence a letter written him by prosecutrix of date February 23. In this letter no mention is made of her visit to Dr. Wedemeyer, but she says she desired to see appellant in order to report to him what Dr. "F" (evidently referring to Dr. Feaster) had told her. One clause of this letter reads "Of course, so far this is only between us and the Drs. and of course they don't know about you being the one for I did not tell them, and to no one else yet but I am worrying my head off about my parents." This would indicate that the letter was written either before she told Dr. Wedemeyer about the alleged assault or that she was concealing from appellant the fact that she had told Dr. Wedemeyer about it. A further quotation from this letter reads:

"Louis can you imagine how you had insulted me? You know yourself that you did not do anything but wrong to me that nite for I had begged you and cried and told you to rather kill me than do anything of that kind but you did not do anything else but pulled me out the car and do your own way—but as sure as God is above us I did not think that night that you did anything that could possibly put me in such a way. I thought I knew everything you did and I guess you thought the same way but we both were very mistaken as we know it now. Now listen, Louis, you know you tried to persuade me to do this every time you were with me and didn't I always tell you that I was afraid? that you can't tell what can happen? and you said you know what you are doing when you do anything of that kind."

Nothwithstanding she testified upon the trial claiming to have no knowledge that appellant had intercourse with her on the night in question, and claiming that she had continually told him that she was unconscious, yet the foregoing quotations do not sustain such view. It is further apparent from this letter that upon being solicited by appellant to have intercourse with him she declined because she was afraid of the result. Appellant introduced another letter written him by prosecutrix from the Maternity Home in Houston on April 9th. In that letter among other things, she says: "You know how I felt the night you ruined me, you knew I

was all excited until I was trembling and I guess one half the time
I was unconscious for you know how long you kept me down.   I
believed you the first month, but after the doctors told me better
I knew better." In his letter she tells him he is the father of her
unborn child; that he must make a decision between then and the
last of the month to do one of three things: first, to marry her;
second, to pay a certain sum of money, or third, to go to the pen-
itentiary, leaving it optional with him to choose one of the three al-
ternatives.

As applicable to the present case we quote from Terry v. State,
266 S. W. 511.

"The question at issue in the present case is whether there was
carnal knowledge of the prosecutrix by the appellant without her
consent.   Upon such an issue experience demonstrates that the evi-
dence of the prosecutrix demands careful scrutiny.   Unexplained
failure to make outcry and delay in making complaint tend to show
consent.   The absence of visible evidence of injury to the prosecu-
trix by the alleged assailant or the spoiling or disarray of her gar-
ments are of probative value; and where the concealment of the al-
leged transaction extends to a time when circumstances render it
impossible to hide it longer, its potency as against the idea of force
is enhanced.   See Ruling Case Law, vol. 22, p. 1187, § 19; also, page
1181, § 12; Brown v. State, 127 Wis. 193, 106 N. W. 536, 7
Ann. Case. 258; Undersill's Crim. Ev. (3d Ed.) p. 847, § 614."

The state may show why the prosecutrix did not make outcry or
complaint, or the reason why she delayed making it.   Sharp v.
State, 15 Tex. Cr. App. 189; Warren v. State, 54 Tex. Cr. R.
443, 114 S. W. 380; Pettus v. State, 58 Tex. Cr. R. 546; 126 S. W.
869.   Are the reasons here satisfactory?   Prosecutrix says she did
not know the carnal act was completed.   She was content not to re-
port an assault with intent to ravish her, and if the developments
had not been such that revealment of her pregnancy could not
longer be delayed who can say that any report would have ever been
made by prosecutrix.   The story told by this unfortunate girl ex-
cites our keenest sympathy, but the statement in one of her letters
may furnish the key to the whole deplorable transaction.   It is to
the effect that when appellant would urge her to extend him sexual
favors she declined, not because the suggestion was obnoxious to her
sense of virtue, but because she feared what might result from such
indulgence, then would come the further assurance from him that he
was wise in such matters.   From all the facts in evidence the con-
clusion would not be exaggerated that such relations as occurred be-
tween appellant and prosecutrix was the result of overpersuasion on
his part and yielding upon hers rather than forcible violation of her
person. The evidence of force and nonconsent is of doubtful potency.

When the state offered to prove by prosecutrix that upon one of her visits to Dr. Feaster he said, "Well, sometimes boys are to blame," and that she replied, "No, not in my case," The objection was made that it was a self-serving declaration on the part of prosecutrix and an attempt to corroborate herself. From the qualification to the bill it appears the learned trial judge admitted this testimony as a part of the outcry of the witness to the assault claimed to have been made upon her and as an expression on her part as to why she did not accuse appellant of having ravished her. It does not occur to us that the statement in question was admissible upon either theory. She did testify that she did not know that an act of intercourse had been consummated with her upon the night in question. This was admissible as a reason why she did not report a rape. The testimony objected to was not an outcry nor a reason why she had not made one. Its only effect was to corroborate herself as to why she had not made such an outcry. In our judgment it was hearsay and comes under the rule that a witness who has not been impeached cannot legally be bolstered up by proof that he had made statements to other persons to same effect as that testified to upon the trial. Many cases will be found cited upon this proposition under Section 181, page 112, Branch's Ann. P. C.

Complaint is made of a hypothetical question propounded to Dr. Martin by the district attorney. After advising the doctor of the facts testified to by prosecutrix he was asked if under those circumstances what was his opinion as to whether prosecutrix was penetrated upon the occasion in question. Objection was interposed that proof of such penetration could not be made in such manner and was not the subject of expert testimony. This question was improper. The witness should not have been permitted to answer it. The bill as presented in the record is somewhat confusing, but is subject to the construction that the testimony of Dr. Martin went to the jury stating in effect that under the circumstances detailed to him in the hypothetical question it was his opinion that penetration was effected.

For the errors discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*